# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Thomas & Wong General Contractor,
a Brunei Darussalam corporation,

        Plaintiff,

v.

**MEMORANDUM OPINION AND ORDER**
Civ. No. 06-515 ADM/RLE

The Lake Bank, N.A.,
d/b/a The Lake Bank,

        Defendant.

___

Mark J. Kallenbach, Esq., Kallenbach Law Office, Minneapolis, MN, argued on behalf of Plaintiff.

Stephanie A. Ball, Esq., Fryberger, Buchanan, Smith & Frederick, P.A., Duluth, MN, argued on behalf of Defendant.

___

## I. INTRODUCTION

On September 26, 2007, the undersigned United States District Judge heard oral argument on Plaintiff Thomas & Wong General Contractor's ("Thomas & Wong") Motion for Summary Judgment, or in the Alternative for Partial Summary Judgment [Docket No. 63] and Defendant The Lake Bank, N.A.'s ("Lake Bank") Motion for Summary Judgment [Docket No. 70]. For the reasons set forth below, Thomas & Wong's Motion is denied and Lake Bank's Motion is granted.

## II. BACKGROUND[1]

Beginning in 1999, Lake Bank made loans to Beardmore Investments, Inc. ("Beardmore Investments"). Beardmore Aff. [Docket No. 66] ¶ 8. At all relevant times, John Beardmore

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

("Beardmore") was the president, a director, and sole shareholder of Beardmore Investments and BDV Investments, Inc. ("BDV"). Id. ¶¶ 3, 5. Beardmore Investments and BDV transacted business with Thomas Kell, III ("Kell"), the President of Lake Bank from September 1999 until mid-2003. Id. ¶ 7; Kell Aff. [Docket No. 77] ¶ 1. As of January 17, 2003, Beardmore Investments owed $570,505 to Lake Bank. Beardmore Aff. Ex. A. Lake Bank's loans to Beardmore Investments were secured by a second mortgage on Beardmore's Arizona home, a 1999 Mercedes vehicle, a 2000 Mystic Ski Boat with a shorestation and lift, a twenty-two percent interest in Founders Mezzanine Stock Fund, and Superior Financial Holding, Inc. ("SFH"), stock (collectively, these assets are the "Beardmore Investments Collateral"). Id. ¶ 13.

In February and March of 2003, Beardmore informed Kell that he was negotiating a financing package with Thomas & Wong, and that Beardmore Investments would use the anticipated loan proceeds from Thomas & Wong to pay Beardmore Investments' debt to Lake Bank. Beardmore Aff. ¶¶ 10, 14. Beardmore orally instructed Kell that upon receipt of a $500,000 wire transfer, Lake Bank was to assign the Beardmore Investments Collateral to Thomas & Wong. Id. ¶¶ 14-15. On March 3, 2003, Kell caused a Lake Bank Employee to fax a one-page document entitled "Wiring Instructions for the Lake Bank NA" to Thomas & Wong's attorney. Id. Ex. B. The document provided Beardmore's account number at Lake Bank. Id. Ex. B. The document is not on Lake Bank's letterhead and has an illegible signature on behalf of "The Lake Bank." Id. Ex. B.

On March 6, 2003, BDV and Thomas & Wong entered into a Promissory Note whereby Thomas & Wong loaned BDV $1,500,000 "with interest thereon at the rate of twenty five percent (25%) as a flat fee and paid in one installment on or prior to May 5, 2003 . . . ."

Id. Ex. C. The Promissory Note provided for a $1,000,000 late fee and liquidated damages of $5,000 per day if BDV failed to timely repay the loan. Id. Ex. C. The collateral for the Promissory Note was six containers of precious metal doré located in Lordsburg, New Mexico. Id.; 1st Ball Aff. [Docket No. 74] Ex. 8. The Promissory note was personally guaranteed by Beardmore and William Cortegiano, BDV's vice president. Beardmore Aff. Ex. C.

On the morning of March 12, 2003, Kell talked by telephone for approximately fifteen minutes with Edward Tarapaski ("Tarapaski") and Jan Wallace ("Wallace"), Thomas & Wong's agents. Tarapaski Dep. (Tarapaski Aff. [Docket No. 86] Ex. A) at 162-163; Pl.'s Mem. [Docket No. 65] of L. in Supp. of Pl.'s Mot. for Summ. J. at 4. Kell, Tarapaski, and Wallace discussed arrangements for Thomas & Wong to wire money to the Beardmore account specified in Lake Bank's March 3, 2003, fax. Tarapaski Dep. at 162-163. When Kell asked if Thomas & Wong "would send the money right away," Wallace responded that Thomas & Wong "need[ed] something in writing from Lake Bank to verify the collateral again and to verify that ownership would transfer to Thomas & Wong upon receipt of the funds." Id. at 163. At 9:23 a.m., Wallace received a faxed letter at Le Vanishe, her place of business, purporting to be from Lake Bank's fax number. Id. at 166; Tarapaski Aff. ¶ 9; 1st Kallenbach Aff. Ex. C. The letter, entitled "Collateral Transfer to Thomas and Wong General Contractor," states:

> Please be advised upon the receipt of wired funds The Lake Bank will assign the following collateral to Thomas and Wong General Contractor.
>
> A second mortgage on Mr. Bea[r]dmore's Arizona home, the home is appraised at $2,000,000 with a first mortgage of $999,997. Equity $1,000,000.
>
> A 1999 Mercedes and a 2000 18 ft. Mystic Ski Boat with a Shorestation and lift total value of $50,000.
>
> A 22% interest in Founders Mezzanine Stock Fund estimated value $150,000.

3

[D]ividends in 2002 of $7,000.  Superior Financial Holdings, Inc. stock value $200,000.

We understand the $500,000 wire will be transferred today.

1st Kallenbach Aff. Ex. C.  The letter concludes with an illegible signature on behalf of "The Lake Bank NA."  Id. Ex. C.  After Wallace received the faxed letter, Tarapaski testified he and Wallace discussed it with Kell.  Tarapaski Dep. at 166.[2]  Later that day, Thomas & Wong wired $500,000 to the Beardmore account at Lake Bank.  1st Kallenbach Aff. Ex. D.  On April 1, 7, and 24, 2003, Thomas & Wong wired additional amounts totaling $700,000 to the same account.  Compl. [Docket No. 1] ¶ 8.  Lake Bank did not transfer documents regarding the Beardmore Investments Collateral until June 2004.

BDV defaulted on the March 6, 2003, Promissory Note by failing to repay $1,500,000 and interest to Thomas & Wong by May 5.  1st Ball Aff. Ex. 3 at BLU06782.  On July 1, 2003, Thomas & Wong initiated litigation against BDV in New Mexico state court seeking a judgment of $3,090,000.  See Thomas & Wong Contractors v. BDV Investments, Inc., Case No. D-623-CV-200300024 (N.M. Hidalgo County 6th Jud. Dist.).  On July 10, Thomas & Wong obtained a writ of execution providing for repossession of BDV's gold metal doré located in New Mexico.  1st Ball Aff. Ex. 5.  In attempting to levy on the writ, Thomas & Wong discovered that the gold doré had been moved to Arizona.  2d Ball Aff. [Docket No. 82] Ex. 1 at BLU04061.  Accordingly, on July 18, 2003, Thomas & Wong filed a second lawsuit against BDV and related parties in Arizona state court (hereinafter the "first Arizona litigation") alleging breach of contract and fraud, and seeking attachment of the gold metal doré.  1st Ball Aff. Ex. 3.  On

---

[2] Kell and Lance Schwanke, a Lake Bank employee responsible for commercial loans in March 2003, aver they are unfamiliar with the March 12, 2003, letter, and they do not recognize the handwriting on the fax.  Kell Aff. ¶¶ 2-4; 1st Schwanke Aff. [Docket No. 73] ¶¶ 3-5.

November 21, 2003, Thomas & Wong obtained a default judgment of $3,669,000 plus accruing penalties and interest against BDV for failure to appear and answer the Arizona complaint. 2d Ball Aff. Ex. 2. However, Thomas & Wong collected only $32,000 on the judgments in the New Mexico and first Arizona litigations. 2d Kallenbach Aff. [Docket No. 79] ¶ 8.

While the New Mexico and the first Arizona litigation against BDV proceeded, Thomas and Wong's former attorney Gary Blume ("Blume") sent Lake Bank a September 5, 2003, letter stating in part that "[d]emand is hereby made for your surrendering of the collateral detailed in the [March 12, 2003] letter . . . . We would expect confirmation of your retention of the collateral and your intent to make these items available to my client for liquidation." Haugan Aff. [Docket No. 72] Ex. 2. Todd Haugan ("Haugan"), an attorney for Lake Bank, alleges he contacted Blume, who stated that Thomas & Wong would recoup the amounts owed by BDV by means other than repossessing and selling the Beardmore Investments Collateral. Id. ¶ 8. In a letter of December 15, 2003, Haugan informed Blume that Lake Bank would "continue to maintain collateral previously provided by John Beardmore, but will not deliver it to either BDV Investments or Thomas & [W]ong Contractors until both parties agree in writing upon a disposition of the subject collateral." Id. Ex. 3.

Correspondence between Thomas & Wong and Lake Bank continued into the spring of 2004. In February and March 2004, Haugan and Blume exchanged drafts of a proposed Release and Indemnification Agreement providing Lake Bank would deliver evidence of title and liens to the Beardmore Investments Collateral to Thomas & Wong. Id. Exs. 4-6. In return, Thomas & Wong would defend, hold harmless, and indemnify Lake Bank against any claims asserted by Beardmore. Id. Exs. 4-6. Ultimately, Thomas & Wong declined to execute the Release and

Indemnification Agreement. Id. ¶ 13.

In a letter of April 21, 2004, Blume informed Haugan that:

I am proceeding with the sale of the real property in Arizona and want to begin collecting all other assets to begin the liquidation process. As such, send to my attention the deed, and any title documents on assets the bank holds, along with the stock certificates that were used as collateral on the long defaulted note. If you have obtained any additional information on the location of the car and boat, I would appreciate having that also.

Id. Ex. 7. Haugan sent a letter dated April 28, 2004, to Clark Griffith ("Griffith"), BDV's attorney, requesting that BDV authorize the transfer of evidence of title and liens to property to Thomas & Wong. Id. Ex. 8.

By letter dated May 21, 2004, Blume provided Haugan a copy of a May 19, 2004, writ of general execution that Thomas & Wong had obtained on the judgment in the first Arizona litigation. Id. Exs. 10-11. On June 7, 2004, Haugan sent Blume original documents in satisfaction of the writ, including a stock certificate representing Beardmore's 200,000 shares of common stock in SFH, certificate of title to the Mercedes motor vehicle, certificate of title to an Ebbtide Runabout boat, and a quit claim deed from Lank Bank to Thomas & Wong regarding the Arizona property. Id. Ex. 12.

On June 21, 2004, the Arizona real property was sold for $1,640,000. 1st Kallenbach Aff. Ex. I. This amount was $360,000,000 less than the $2,000,000 appraised value specified in the March 12, 2003, faxed letter. As of June 21, 2004, the amount due on the first mortgage was $1,032,631, which was $32,634 more than $999,997 figure specified in the March 12, 2003, faxed letter. Id. Ex. I. $28,655 in delinquent real estate taxes for the years 2001, 2002, and 2003 were deducted from the contract sales price. Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 8. Thomas & Wong avers it was unable to take possession of the Mercedes or the ski boat.

Additionally, Thomas & Wong avers that the SFH stock and the Founders Mezzanine stock had become worthless. According to the March 12, 2003, faxed letter, the car, boat, SFH stock, and the Founders Mezzanine stock had a combined value of $407,000 on March 12, 2003.

On July 12, 2005, Thomas & Wong filed a lawsuit against Blume and Wallace in Arizona state court (hereinafter the "second Arizona litigation"). See Thomas & Wong General Contractor, Inc. v. Blume Law Firm, P.C., No. CV2005-051325 (Ariz. Superior. Ct. Maricopa County). On August 10, 2007, the malpractice claims against Blume were dismissed pursuant to a stipulated settlement of $50,000. 2d Kallenbach Aff. ¶ 9. The claims against Wallace for breach of fiduciary duty are still being litigated. Id. ¶ 10.

On February 7, 2006, Thomas & Wong initiated the instant litigation against Lake Bank. The Complaint asserts claims for breach of contract, fraud, conversion, and bailee liability. Thomas & Wong seeks $828,289 in damages from Lake Bank, based on the theory that Lake Bank failed to timely deliver the Beardmore Investments Collateral and therefore is responsible for: (1) the alleged $360,000 decrease in value of the Arizona real property from March 12, 2003, to June 21, 2004; (2) the $32,634 increase in the amount of the first mortgage from March 12, 2003, to June 21, 2004; (3) the alleged tax delinquency of $28,655 on the Arizona real property; (4) the alleged $357,000 decrease in value of the SFH and Founders Mezzanine stock from March 12, 2003, to June 2004; and (5) Thomas & Wong's inability to realize any proceeds of the alleged $50,000 value of the car and ski boat as of March 12, 2003. Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. at 7-9.

## III. DISCUSSION

### A. Informal Motions to Strike

In their memoranda, both Thomas & Wong and Lake Bank request that certain materials be stricken from the record. Thomas & Wong argues Lake Bank's Motion for Summary Judgment and supporting documents are untimely under Local Rule 7.1(b)'s requirement that moving papers must be filed at least 45 days prior to the hearing of a dispositive motion. D. Minn. LR 7.1(b). This Court heard oral argument on September 26, 2007. Lake Bank filed its Motion for Summary Judgment on Tuesday, August 14, 2007, which was 43 days before the hearing. Lake Bank's Motion therefore is untimely under Local Rule 7.1(b).

Local Rule 7.1(d) addresses untimely filing:

> In the event a party fails to timely deliver and serve a memorandum of law, the Court may strike the hearing from its motion calendar, continue the hearing, refuse to permit oral argument by the party not filing the required statement, consider the matter submitted without oral argument, allow reasonable attorney's fees, or proceed in such other manner as the Court deems appropriate.

D. Minn. LR 7.1(d). Lake Bank's counsel avers that at the suggestion of the Court's calendar clerk, she proposed a modified briefing schedule so that the parties' cross motions for summary judgment could be argued on the same day. 3d Ball Aff. [Docket No. 91] ¶ 6. Lake Bank's counsel notified Thomas & Wong's counsel, who did not object until after Lake Bank filed its moving papers. Id. The Court denies Thomas & Wong's request to strike Lake Bank's moving papers. Lake Bank's proposed deviation from the briefing schedule was a convenience to the Court, and Lake Bank gave notice to Thomas & Wong's counsel, who failed to object in a timely manner. Thomas & Wong does not claim any prejudice from the minor deviation from the deadlines of Local Rule 7.1.

In their memoranda, both parties request that certain affidavits be stricken from the record. See Pl.'s Mem. of L. in Opp'n to Def.'s Mot. for Summ. J at 8; Def.'s Mem. [Docket No. 81] of L. in Opp'n to Pl.'s Mot. for Summ. J. at 14-30. However, the Court finds that consideration of these affidavits does not affect its analysis of the parties' cross motions for summary judgment. Therefore, the parties' informal motions to strike affidavits from the record are denied.

**B.     The Cross Motions for Summary Judgment**

Federal Rule of Civil Procedure 56 provides that summary judgment shall issue "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**1.     Lake Bank's Motion for Summary Judgment**

**a.     Authenticity of the March 12, 2003, Fax Letter**

Lake Bank argues that all of Thomas & Wong's claims fail as a matter of law because Thomas & Wong cannot establish the authenticity of the March 12, 2003, letter. Lake Bank emphasizes the letter is not on Lake Bank's letterhead, is signed generically by Lake Bank rather

than by an individual representative of Lake Bank, and that Lake Bank officers and employees do not recognize the illegible signature.  See Kell Aff. ¶¶ 2-4; 1st Schwanke Aff. ¶ 3-5. However, the mechanically generated fax header lists Lake Bank's fax number.  1st Kallenbach Aff. Ex. C.  Corroborative of the letter's authenticity is Tarapaski's testimony that on March 12, 2003, Kell, then Lake Bank's president, agreed to send such a letter to Tarapaski and Wallace. Tarapaski Dep. at 163.  Tarapaski also claims that after he and Wallace received the fax at Le Vanishe, Kell followed up by asking them, "Will you now release the money?"  Id. at 166. Based on this testimony, a jury could find that Kell authorized the March 12, 2003, letter.  There is a genuine issue of material fact regarding whether the March 12, 2003, faxed letter is authentic.

        **b.**     **The Credit Agreement Statute of Frauds**

             **i.**     **The Credit Agreement Statute of Frauds Applies**

Lake Bank argues that the credit agreement statute of frauds in Minn. Stat. § 513.33 completely bars Thomas & Wong's claims.  The statute provides that "[a] debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."  Minn. Stat. § 513.33, subd. 2.  For the credit agreement statute of frauds to apply, Lake Bank must establish that: (1) the March 12, 2003, letter constitutes a "credit agreement," and (2) Thomas & Wong and Lake Bank qualify as a debtor and creditor, respectively, under the statute.

The first issue is whether the March 12, 2003, faxed letter, assuming it is authentic, constitutes a credit agreement.  Minn. Stat. § 513.33 defines "credit agreement" as "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend

credit, or to make any other financial accommodation." Minn. Stat. § 513.33, subd. 1. Case law interpreting § 513.33, which was enacted in 1984, is sparse. The leading case is the Minnesota Supreme Court's 1992 decision in Rural American Bank v. Herickhoff, 485 N.W.2d 702 (Minn. 1992). There, a bank made separate farm loans to Mark Herickhoff ("Mark") and his father, Ben Herickhoff ("Ben"), that would allow Mark to plant acreage on his farm. Id. at 704. The bank's loan agreement file included a document stating that proceeds from Mark's crops would be used to pay Ben's loan first. Id. The document was on bank letterhead, prepared by bank officials, and signed by Mark and his wife. Id. However, the bank applied the proceeds to Mark's loan first. Id. The Minnesota Supreme Court held that the Bank's alleged promise to apply proceeds to Ben's loan first "is precisely the kind of 'financial accommodation' intended to be covered by the statute," and therefore the credit agreement statute of frauds applied. Id. at 706. The Herickhoff court ultimately concluded that the writing satisfied the credit agreement statute of frauds. Id. at 708.

The Minnesota courts have not directly addressed whether assurances between two lenders, where the assurances involve the same borrower, constitute a credit agreement under Minn. Stat. § 513.33. Interpreting Colorado's credit agreement statute of frauds, which is similar to Minnesota's, the Colorado Supreme Court held that assurances from one lender to another involving the same borrower constituted a credit agreement, even though the lenders were not in a borrower-lender relationship with each other. Schoen v. Morris, 15 P.3d 1094, 1097-98 (Col. 2000). Other courts have also broadly construed state credit agreement statutes of frauds. See e.g., Whirlpool Fin. Corp. v. Sevaux, 96 F.3d 216, 222-23 (7th Cir. 1996) (concluding that promise to invest was a credit agreement under Illinois statute because debt financing was

contemplated).

The broad language of Minn. Stat. § 513.33 "reaches not only agreements to 'lend or forbear repayment of money,' but also any other 'financial accommodation.'" Pako Corp. v. Citytrust, 109 B.R. 368, 377 (D. Minn. 1989) (cited in Herickhoff, 485 N.W.2d at 706). Here the March 12, 2003, letter is inextricably intertwined with two credit agreements. The first credit agreement is the agreement whereby Thomas & Wong loaned $1,500,000 to BDV and BDV agreed to repay the loan. The March 6, 2003, Promissory Note specified certain gold doré as collateral. Around the same time as the execution of the Promissory Note, it appears that Beardmore, on behalf of BDV, and Thomas & Wong orally agreed that the Beardmore Investments Collateral held by Lake Bank would serve as additional collateral for the Promissory Note between Thomas & Wong and BDV. Beardmore Aff. ¶ 14. Accordingly, Beardmore avers he orally instructed Kell that when Thomas & Wong wired funds to Beardmore's Lake Bank account, Lake Bank was to transfer documents regarding the Beardmore Investments Collateral to Thomas & Wong. Id. This oral agreement specifying additional collateral is part and parcel of the credit agreement whereby Thomas & Wong loaned $1,500,000 to BDV.

The second credit agreement addresses Lake Bank's outstanding loans to Beardmore Investments as of March 12, 2003. Those loans were secured by the Beardmore Investments Collateral. The record shows that on March 12, 2003, Tarapaski and Wallace, acting as Thomas & Wong's agents, requested that Lake Bank, a creditor of Beardmore Investments, transfer the Beardmore Investments Collateral to Thomas & Wong upon Lake Bank's receipt of funds wired to Beardmore's account. By requesting Lake Bank to transfer its collateral and forebear the

exercise of any remedies it may have regarding the collateral, Thomas & Wong sought a financial accommodation from Lake Bank. Such a financial accommodation is a credit agreement under Minn. Stat. § 513.33.

The next issue is whether Thomas & Wong and Lake Bank qualify as a debtor and a creditor with respect to the March 12, 2003, faxed letter. A "creditor" is defined as "a person who extends credit under a credit agreement with a debtor," and a "debtor" is defined as "a person who obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor." Minn. Stat. § 513.33, subd. 1. For the purposes of the March 12, 2003, letter, Lake Bank is a creditor because it held the Beardmore Investments Collateral as security for a loan to Beardmore Investments. Thomas & Wong requested that Lake Bank transfer its collateral to Thomas & Wong. Such a financial accommodation is a credit agreement under Minn. Stat. § 513.33. Therefore, Thomas & Wong is a "debtor" under the statute because it sought a credit agreement with a creditor. The March 12, 2003, letter constitutes a credit agreement and the credit agreement statute of frauds applies.

### ii. The March 12, 2003, Letter Does Not Satisfy the Statute of Frauds

A credit agreement satisfies the statute of frauds if it is "in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." Minn. Stat. § 513.33, subd. 2. The March 12, 2003, letter is in writing. It also expresses consideration: Lake Bank promised to transfer the Beardmore Investments Collateral to Thomas & Wong upon receipt of wired funds from Thomas & Wong. Although there is a genuine issue of material fact regarding whether Lake Bank, the creditor, signed the document, it is undisputed that Thomas & Wong did not sign the document. Therefore, the March 12, 2003,

letter does not satisfy Minnesota's credit agreement statute of frauds.

Alternatively, the March 12, 2003, letter fails to satisfy Minn. Stat. § 513.33 because it fails to include all the relevant terms and conditions of a collateral transfer agreement. For Lake Bank to convey the Beardmore Investments Collateral, authorization from Beardmore Investments was required. However, the March 12, 2003, letter lacks Beardmore Investments' written authorization for Lake Bank to transfer the Beardmore Investments Collateral. Therefore, the March 12, 2003, letter fails to satisfy the statute of frauds in Minn. Stat. § 513.33 and Thomas & Wong's breach of contract claim must be dismissed.

### c. Fraud, Conversion, and Bailee Liability

Thomas & Wong's claims for fraud, conversion, and bailee liability also arise out of the March 12, 2003, letter. Thomas & Wong's claims of promissory estoppel and unjust enrichment, asserted for the first time in its summary judgment moving papers, also arise out of the March 12, 2003, letter. See Pl.'s Mem. of L. in Supp. of Pl.'s Mot. for Summ. J at 14-15. These claims are all barred by Minn. Stat. § 513.33. See Minn. Stat. § 513.33, subd. 2 ( "A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."). Thomas & Wong cannot escape the credit agreement statute of frauds by asserting alternative claims based on the same credit agreement. See Greuling v. Wells Fargo Home Mortgage, Inc., 690 N.W.2d 757, 761-62 (Minn. Ct. App. 2005) (concluding that lack of compliance with credit agreement statute of frauds barred claim of promissory estoppel). Lake Bank's Motion for Summary Judgment is granted.

### 2. Thomas & Wong's Motion for Summary Judgment

Having granted Lake Bank's Motion for Summary Judgment, Thomas & Wong's Motion for Summary Judgment is denied.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Thomas & Wong General Contractor's Motion for Summary Judgment, or in the Alternative for Partial Summary Judgment [Docket No. 63] is **DENIED**; and

2. Defendant The Lake Bank, N.A.'s Motion for Summary Judgment [Docket No. 70] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:

   s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: December 21, 2007.